ROBERT HOWARD, APPELLANT, V. STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY, APPELLEE.
496 N.W.2d 862

Filed March 5, 1993.   No. S-90-607.

Lawrence E. Barrett and Clark J. Vanskiver, of Sodoro, Daly & Sodoro, for appellant.

Michael F. Coyle, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

CAPORALE, J.
### I. STATEMENT OF CASE
Under a policy of insurance issued to him by the defendant-

appellee, State Farm Mutual Automobile Insurance Company, the plaintiff-appellant, Robert Howard, seeks to recover the damages he claims to have sustained as the result of an automobile fire. Pursuant to verdict, the district court entered judgment in favor of State Farm. Howard asserts the district court erred in (1) failing to strike certain venirepersons for cause, (2) permitting him to be improperly impeached, (3) failing to grant his motion to strike State Farm's amended answer, (4) failing to grant his motion to strike a portion of the aforesaid answer, and (5) overruling his pretrial motions for summary judgment. We affirm.

## II. FACTS

Howard, a licensed automobile dealer, owned and operated a used car and repossession business in Omaha, Nebraska. By the time of trial, he had purchased and sold some 150 automobiles.

In the fall of 1988, Howard saw in the parking lot of an Omaha restaurant a 1964 red Corvette with out-of-state license plates. After a close look at the automobile, Howard entered the restaurant and asked two persons whom he believed to be the owners whether the vehicle was for sale. The two replied that it was not, but Howard nonetheless handed them a business card and asked them to call him should they ever wish to part with the vehicle.

Approximately 3 to 4 weeks later, Howard received a telephone call from a man who identified himself as "the fellow who had the Corvette in the restaurant in Omaha . . . ." The caller informed Howard that he had decided to sell the Corvette and asked Howard to pay for his expenses in bringing the vehicle to Nebraska. Howard told the man to save his receipts and Howard would reimburse him the costs for gas, food, and the like. Negotiations set the sale price at $9,500, which Howard intended to pay by check. The caller told Howard that he would be contacted upon the caller's arrival in Omaha. Howard did not know whether this was the same man with whom he had spoken at the restaurant.

At around 9:30 or 10 p.m. on October 1 or 2, 1988, Howard again received a call placed from a pay telephone near Howard's home. Howard told the male caller that Howard would drive up

to the corner and make a U-turn so that the caller could follow Howard back to his (Howard's) home.

The caller, who identified himself as "Jay," was accompanied by a woman who drove a separate automobile. The two followed Howard to his home, where they put the Corvette in Howard's garage, and Howard paid the couple $50 to $60 for food and gasoline expenses.

The woman identified herself as the owner of the vehicle, and that evening Howard gave the couple $6,500 in cash "for tax purposes" and, since they would not accept a check, told them that they would have to call him the next morning so that he could take them to his bank to give them the remainder of the purchase price in cash. The woman gave Howard a bill of sale, upon which she signed her name as "Kathern Carter." Her signature was witnessed and notarized by Howard's wife, who did not require that the woman establish her identity. The bill of sale recited that "Kathern Carter" had "sold one 1964 Corvette . . . to Bob Howard for the sum of $6500 on the 1st day of October, 1988."

The Corvette remained in Howard's garage for the evening. At approximately 10:30 the next morning, the couple contacted Howard and then drove to his home. Once there, the man rode with Howard to the latter's bank, where Howard said he cashed a check drawn by his wife for $3,000, which he gave to the man.

However, Howard at no time received the actual certificate of title to the automobile. Rather, he obtained only a duplicate photocopy of the title certificate, stamped "photocopy," which listed Kathern Carter as the owner of record. But on two Georgia registration receipts and a State Farm insurance identification card which were given to Howard when he purchased the vehicle, the name of the owner of record was spelled as "Kathrine Carter" on all three documents, but signed "Katherine Carter" on the back of one of the registration receipts. The insurance card, allegedly issued by State Farm, was later discovered by State Farm to be a forgery.

Howard acknowledged that the woman's first name was spelled on various documents in three different ways and that the signature on one of the Georgia registration receipts did not appear to be the same as that on the bill of sale he was given.

Howard nonetheless claimed he did not "study a signature or didn't even think about studying the signature. [He] just looked at the [vehicle identification] numbers and the Corvette and basically that was about it." Howard stated that it "[l]ooked like a proof of ownership to" him.

Howard testified that he did not get the original title because the couple "said they had money borrowed against the title, there was a lien filed against the original title. They had to go back and pay off the lien with the money that I paid them for the automobile." However, the document that Howard received did not have a lien noted on it. Howard expected "Jay" to mail the title to him, but never heard from him again. Indeed, after the purchase of the automobile, Howard had no contact with either the seller or her male companion.

Howard testified at trial that although he did not attempt to write the alleged owners of the Corvette, he did try to call them once, but to no avail. However, during his pretrial deposition, Howard represented that he had never attempted to call the man or woman after the sale. He could not remember what he did with the couple's telephone number, nor could he recall the area code or state in which they resided.

Howard described the automobile as "all original," except that the wheels had belonged to a later model Corvette. He wanted to buy the vehicle "[b]ecause it was a fantastic buy," considering he estimated its retail value to be "[a]nywhere between eighteen and $24,000" or "around $25,000, probably between 20 and $25,000." As Howard put it, "I was greedy because it's not every day I run across a deal like that. If I had a chance to do it again, I know I would do it again even if I had to suffer through all this."

Howard testified that when purchasing an automobile, he "usually select[ed] the [vehicle identification] number, g[o]t all the paperwork for the car, and . . . usually [paid] for it. Lots of times it takes them fifteen days to send [him] a title." When purchasing an automobile from an out-of-state seller, Howard's usual practice was to take the title to be inspected. However, it was not unusual in his business to buy a vehicle and wait for the title.

In his deposition, Howard stated:

He said I'll send you—you know, it was a bullshit deal. I had never done business like that before from out of state, because usually I don't buy anything out of state unless I've got everything sitting right in front of me.

But I didn't want it to slip through my fingers. That's the basic truth of it. I figured it was too good to be true.

On October 6, 1988, Howard made an application for insurance on the Corvette through his wife's State Farm agent, a person with whom Howard had not previously personally dealt.

Howard told the agent that he purchased the Corvette as "a pleasure car," planned to drive it less than 6,000 miles annually, and appraised its value at $21,000.

Howard claimed to have had no plans to sell the Corvette, wishing to keep it as an investment for his children's college education. He did not register the Corvette, even though he drove it on a number of occasions.

Howard had represented during his deposition that he kept the Corvette in his garage at all times unless he was driving it; at trial, he testified that the first night he left the vehicle parked outside his garage was the night of the fire. He claimed that he had purchased a new vehicle and had parked the Corvette in back of his office in a fenced-in lot with the intention of purchasing a tarpaulin to cover it.

Howard said that on or about the morning of January 2, 1989, his landlord told him that the Corvette had caught on fire the prior evening. Howard contacted the arson bureau because he felt that the fire was suspicious, as "there was no reason the car should ever have burned up." Howard told the investigating officer that the fire would have occurred somewhere between 3 p.m. on January 2 and 9 a.m. on January 3. The officer discovered two melted plastic containers behind the front seat of the charred Corvette. The containers had a "very strong smell of gasoline."

The investigating Nebraska State Patrol officer discovered that the vehicle identification numbers on the glove compartment, engine, and valve tappet cover had been altered. The alterations attempted to change the last three digits from "868" to "888." The identification number on the transmission had

not been altered, presumably because it was more difficult to reach than the others, and thus still read "868." The investigator was unable to locate the confidential identification number on the automobile's frame. The investigation revealed that the automobile had been stolen in October 1986 in Seminole County, Florida.

Howard filed an affidavit of vehicle loss or damage with State Farm, on which he listed the Corvette's purchase price as $9,600. Howard told a State Farm field claims representative and a claims specialist that he suspected a disgruntled former girl friend, a "fatal attraction" thing, may have been involved in the arson. Moreover, Howard told the claims representative that he paid $18,000 for the automobile. After inspecting the automobile and discovering the altered numbers, the claims representative recommended that State Farm contact the police, for this was a "hot" vehicle.

According to Howard, the photostatic copy of the title was in the Corvette when it burned, as was the receipt Howard claimed he obtained for the $3,000 cash he paid to the couple.

At trial, a body shop manager and Corvette aficionado testified that in his opinion the vehicle was valued at between $15,000 and $20,000 prior to the fire. He further opined that the repair costs on it after the fire would be $10,000 to $12,000, such that he would not repair it. Howard testified that in his experience as an automobile dealer, the Corvette was a "total loss."

State Farm notified Howard by two separate letters that his claim was denied because he did not have a legally enforceable insurable interest in the Corvette and refunded in full the premium Howard had paid.

### III. ANALYSIS

Although it is axiomatic that a thief acquires no title in an automobile he or she steals and can transfer no title in and to such a vehicle, see *First Nat. Bank & Trust Co. v. Ohio Cas. Ins. Co.*, 196 Neb. 595, 244 N.W.2d 209 (1976), it appears that we have not heretofore determined whether a subsequent innocent purchaser for value of a stolen vehicle may nonetheless have an insurable interest in the vehicle.

Neb. Rev. Stat. § 44-103(12) (Reissue 1988) defines an insurable interest as meaning "every interest in property or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured." A number of courts, reasoning that an innocent subsequent purchaser of a stolen vehicle has a pecuniary interest in its continued existence and would suffer an economic loss from its theft or destruction, have concluded under similar statutes that such purchasers do indeed have an insurable interest. E.g., *Snethen v. Okl. U. of Farmers Ed. & Co-op. U.*, 664 P.2d 377 (Okla. 1983); *Webb v. Mutual Insurance*, 44 Colo. App. 210, 620 P.2d 38 (1980); *Butler v. Farmers Ins. Co. of Arizona*, 126 Ariz. 371, 616 P.2d 46 (1980).

We adopt that reasoning and thus hold that a subsequent innocent purchaser of a stolen vehicle acquires an insurable interest in such vehicle. Consequently, Howard had no insurable interest in the Corvette if he either stole it or purchased it under other than innocent circumstances.

### 1. CAUSE TO STRIKE VENIREPERSONS

In connection with the first assignment of error, Howard claims the district court mistakenly refused to strike for cause venirepersons who were holders of State Farm insurance policies of one kind or another.

Howard's voir dire inquiries revealed the presence of three current State Farm policyholders on the venire: Dudley (homeowners policy), Brannen (automobile policy), and Pirrone (automobile and homeowners policies). Howard unsuccessfully moved that each of these persons be stricken for cause. His contention was that such venirepersons were biased because State Farm policyholders pay a membership fee, are entitled to insure additional vehicles, have some, albeit limited, voting privileges at membership meetings, and share in the earnings and savings of State Farm. At the completion of his portion of the voir dire, Howard passed the venire panel for cause. He then exercised all three of his peremptory challenges so as to strike Pirrone and two other venirepersons; however, Dudley and Brannen were seated as jurors.

### (a) Passing Venire Panel for Cause

Although we, in *Sayer Acres, Inc. v. Middle Republican Nat.*

*Resources Dist.*, 205 Neb. 360, 363, 287 N.W.2d 692, 694 (1980), held that "[b]y passing the jurors for cause the appellants waived any objection to their selection as jurors," we have in other cases declared that a party who fails to challenge prospective jurors for disqualification *and* passes them for cause waives any objection to their selection as jurors. *Bittner v. Miller*, 226 Neb. 206, 410 N.W.2d 478 (1987); *Schroll v. Fulton*, 213 Neb. 310, 328 N.W.2d 780 (1983); *Regier v. Nebraska P. P. Dist.*, 189 Neb. 56, 199 N.W.2d 742 (1972). See, also, *State v. Green*, 236 Neb. 33, 458 N.W.2d 472 (1990), *overruled on other grounds, State v. Tingle*, 239 Neb. 558, 477 N.W.2d 544 (1991); *State v. Harris*, 184 Neb. 301, 167 N.W.2d 386 (1969); *State v. Eggers*, 175 Neb. 79, 120 N.W.2d 541 (1963). *Regier* expressly notes that "[n]o challenge for cause by the defendant was overruled . . . ." 189 Neb. at 59, 199 N.W.2d at 744. Such also may have been the case in *State v. Eggers, supra*.

To obviate any confusion the *Sayer* language may create, we now specifically hold that a party unsuccessfully challenging the seating of a venireperson as a juror who subsequently passes the venire panel for cause thereby merely indicates that subject to the previously made cause objection, he or she is ready to exercise his or her peremptory challenges. But a party failing to challenge the seating of a venireperson as a juror, who subsequently passes the venire panel for cause, thereby waives any objection that might otherwise have existed to the seating of the unchallenged venireperson as a juror. It must also be remembered that a party who challenges a venireperson for cause but fails to exercise all of his or her peremptory challenges likewise waives any objection to the seating of the challenged venireperson as a juror. See, *State v. Ballard*, 237 Neb. 729, 467 N.W.2d 662 (1991); *State v. Green, supra*; *State v. McCoy*, 228 Neb. 178, 421 N.W.2d 780 (1988); *Curran v. Percival*, 21 Neb. 434, 32 N.W. 213 (1887).

### (b) Mutual Policyholders

That holding requires that we here consider how mutual insurance policyholders are to be treated for purposes of jury service in actions in which the issuing mutual company is a party.

Challenges for cause are statutorily prescribed. Neb. Rev. Stat. § 25-1601 (Reissue 1989) exempts from jury service, among others, "persons . . . who are parties to suits pending in the district court of the county of his, her, or their then residence for trial at that jury panel." It is sufficient cause for challenge if a juror is deemed incompetent under § 25-1601. Neb. Rev. Stat. § 25-1609 (Reissue 1989).

The general rule is that a person is incompetent to serve as a juror in a case where he or she has a direct pecuniary interest in the result of the action.

Georgia appears to be the only jurisdiction which requires all mutual company policyholders to be struck for cause in actions in which the mutual company is a party. In *Weatherbee v. Hutcheson*, 114 Ga. App. 761, 152 S.E.2d 715 (1966), the Georgia Court of Appeals held:

> If the company is a mutual one in which the policyholder has an interest in the assets of the company, usually realized by way of dividends reducing the policy premium, it is proper to qualify the jurors as to whether any of them are policyholders or related within the prohibited degree to policyholders. . . . But if it should appear that the company is a stock company the inquiry would be irrelevant, for in that event the policyholder has nothing more than a contract with the company, giving him no interest in its assets, and he is no more disqualified than would be a depositor in a bank that is a party to litigation.

*Weatherbee* at 765, 152 S.E.2d at 718-19.

The first question is whether State Farm is a true mutual company. Howard asserts that State Farm's use of the term "Mutual" in its name is sufficient to prove that it is organized as a mutual company. State Farm made an admission, of sorts, when it stated during voir dire examination that "State Farm is a mutual company so it's not really a corporation . . . ." An examination of Howard's State Farm insurance policy reveals that State Farm did hold itself out to be a mutual company. This, of course, is not the insurance policy of the questioned venirepersons. During his voir dire, Howard did not delve into the terms of the venirepersons' policies with State Farm. Thus,

it is unclear whether the policies of the venirepersons in question were mutual policies. The failure of the record to establish the facts in that regard is fatal to Howard's claim.

Nonetheless, we analyze the remaining issues in this regard in order to give guidance in future cases.

At this juncture we note that in some jurisdictions a distinction is made between assessable and nonassessable mutual policies. An assessable insurance policy is defined as one under which an insured is liable for additional premium if the losses are unusually large. Black's Law Dictionary 116 (6th ed. 1990). In these jurisdictions, policyholders of a mutual insurance company subject to being assessed for losses incurred by the company are deemed to be incompetent to serve as jurors in an action to which the mutual insurance company issuing the policy is a party. However, where the challenged venireperson is a policyholder in a nonassessable mutual insurance company, incompetency to serve is not presumed.

Illustrative is the reasoning present in *Kendall v. Prudential Insurance Co. of America*, 327 S.W.2d 174 (Mo. 1959). Therein, the Supreme Court of Missouri was called upon to determine whether the trial court's failure to sustain plaintiff's challenges for cause of four venirepersons who were policy-holders with defendant insurance company constituted reversible error. In affirming the trial court's ruling, the *Kendall* court reasoned:

> While we agree that an employee or agent of a defendant . . . is subject to challenge for cause, we also agree . . . that a challenge for cause is not required to be sustained as to every kind of policyholder under all circumstances. In view of modern widespread use of all kinds of insurance, such a rule would be unreasonable at least as to those with nonassessable policies or those who do not participate in policy dividends.

*Kendall, supra* at 177-78. Accord, *George v. Howard Const. Co.*, 604 S.W.2d 685 (Mo. App. 1980); *State Farm Fire & Casualty Co. v. Hornback*, 217 Kan. 17, 535 P.2d 441 (1975); *Kanzenbach v. S.C. Johnson & Son, Inc.*, 273 Wis. 621, 79 N.W.2d 249 (1956); *Fedorinchik v. Stewart*, 289 Mich. 436, 286 N.W. 673 (1939).

It seems to us, however, the better rule is one which depends upon a particular venireperson's ability to decide the case fairly solely upon the evidence presented at trial, irrespective of the kind of policy he or she owns. See, e.g., *Good v. Farmers Mut. Ins. Co.*, 265 Wis. 596, 62 N.W.2d 425 (1954).

Any dividends a typical mutual policyholder would receive are presumably negligible, and such policyholder's interest would in most instances simply be too remote and minute to overbalance a sense of justice to the litigants. To say that because a mutual policyholder shares in the earnings and savings of a mutual company the policyholder is deemed incompetent is spurious. In one sense, all holders of insurance policies share in the earnings and savings of the insurers, be the insurers organized as stock or mutual companies, for a lower loss experience results in lower premiums, regardless of the name we append to the structure through which the business of apportioning and distributing losses is accomplished.

We hold that even the holder of an assessable policy issued by a mutual insurance company named as a party in an action may serve as a juror if the policyholder can decide the case fairly solely upon the evidence presented at trial. Thus, the district court did not abuse its discretion in refusing to strike for cause the three challenged venirepersons.

## 2. IMPEACHMENT

In his second assignment of error, Howard alleges that the trial court incorrectly permitted State Farm to impeach him at trial without laying proper foundation.

In the circumstances presented, it is irrelevant whether a proper foundation was laid for Howard's impeachment, for the inconsistent statements of a party are properly admissible as rebuttal evidence. *Fortin v. Hike*, 205 Neb. 344, 287 N.W.2d 681 (1980).

The use of inconsistent statements is controlled by statute. Neb. Rev. Stat. § 27-613 (Reissue 1989) provides:

(1) In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown or its contents disclosed to him at that time, but on request the same shall be shown or disclosed to

opposing counsel.

(2) Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in subdivision (4)(b) of section 27-801.

Neb. Rev. Stat. § 27-801(4)(b) (Reissue 1989) defines, among other things, a party's own statement as not being hearsay. Thus, the foundational requirement of § 27-613, that a witness to be impeached be given an opportunity to explain or deny an apparently inconsistent statement, does not apply to admissions or statements offered against a party to the action, if the admissions or statements were made by that party. *Hyde v. Cleveland*, 203 Neb. 420, 279 N.W.2d 105 (1979). See *Fortin v. Hike, supra.* This has long been the rule with regard to admissions and statements of a party, predating this state's adoption of its present evidence code. See, e.g., *Bartlett v. Cheesebrough*, 32 Neb. 339, 49 N.W. 360 (1891).

McCormick on Evidence § 37 at 124-25 (4th ed. 1992) helps raze Howard's argument.

If a party takes the stand as a witness, and the adversary desires to use a prior inconsistent statement of the witness, the statement is receivable in two aspects, first as the admission of the opposing party, and second, as an inconsistent statement to impeach the witness. In the first aspect, it is relevant evidence upon the fact issues; in the second aspect, it is not. In jurisdictions requiring traditional foundation questions for impeachment, the requirement is almost universally held inapplicable. There is less danger of surprising a party than a witness, and the party will have ample opportunity for denial or explanation after the inconsistent statement is proved. In these jurisdictions the courts on occasion may inadvertently assume that the requirement applies to the party-witness. Sometimes courts have imposed the requirement if the proponent offers the statement only for

impeachment, and one court held the judge has discretion to impose the requirement of a foundation question as prerequisite to proof of a party-witness admission. These niggling qualifications seem hardly worth their salt and in jurisdictions which otherwise require the foundation question the sensible practice is the simple one of dispensing with the "foundation" entirely in respect to parties' admissions.

Accordingly, the district court did not err in permitting the use of Howard's inconsistent pretrial statements.

### 3. Failure to Strike Amended Answer

In his third assignment of error, Howard urges us to find that the district court erred in failing to grant his motion to strike State Farm's amended answer.

Shortly before trial, State Farm, pursuant to leave, amended its answer by alleging that Howard should have known that the Corvette was stolen and that based upon the facts and circumstances surrounding the sale, Howard had a duty to make further inquiry regarding the seller's status as rightful owner. Howard contends the amendments should not have been permitted, as State Farm was estopped from changing its position.

As Howard correctly states in his brief, it has long been the rule in this state that an insurer which gives one reason for its conduct and decision as to a matter of controversy cannot, after litigation has begun, defend upon another and different ground. *Boren v. State Farm Mut. Auto. Ins. Co.*, 225 Neb. 503, 406 N.W.2d 640 (1987); *Mutual Benefit Life Ins. Co. v. Chisholm*, 213 Neb. 301, 329 N.W.2d 103 (1983); *Hamblin v. Equitable Life Assurance Society*, 124 Neb. 841, 248 N.W. 397 (1933); *Continental Ins. Co. v. Waugh*, 60 Neb. 348, 83 N.W. 81 (1900). However, unlike the situation presented here, the cases applying this rule dealt with circumstances whereunder an insurer altered its position in an attempt to defend upon an entirely separate and different ground.

In *Chisholm, supra,* for example, the insurer filed its original petition seeking to rescind the insured's policy on the ground of misrepresentation. The insured allegedly misrepresented that

he had received medical treatment beyond the answer of routine examinations given on his application for group life insurance. The insurer subsequently amended the petition to include a new ground of misrepresentation by the insured in his failure to disclose his alleged alcoholism. On appeal, we upheld the trial court's granting of the insured's motion to strike the amendment because "on no occasion prior to the second amended petition did [the insurer] ever state that the insured's misrepresentation of alcoholism was a basis for its denial of the claim." *Chisholm, supra* at 305, 329 N.W.2d at 105.

Here, State Farm's amendments did no more than explicate the defense asserted in its letters of denial to Howard and in its original answer. Indeed, the amendments went to the heart of the matter, i.e., whether Howard had an insurable interest in the Corvette; more specifically, whether he himself stole the vehicle, and if not, whether he was an innocent subsequent purchaser for value.

A request to amend pleadings is addressed to the discretion of the trial court. Absent an abuse of discretion, the trial court's decision will be affirmed. *Bittner v. Miller*, 226 Neb. 206, 410 N.W.2d 478 (1987); *First Nat. Bank v. Schroeder*, 218 Neb. 397, 355 N.W.2d 780 (1984). We cannot under the circumstances say the district court abused its discretion in denying Howard's motion to strike. Howard's third assignment of error is without merit.

### 4. FAILURE TO STRIKE CHARACTERIZATION

Howard contends in the fourth assignment of error that the district court erred in failing to grant his motion to strike a characterization in the amended answer.

The challenged characterization related to an automobile buyer's duty to investigate. Aside from Howard's discussion with regard to the trial court's refusal to grant Howard's motion to strike State Farm's amended answer, this particular assignment of error is not discussed in his brief. To be considered by an appellate court, error must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred. *Maack v. School Dist. of Lincoln*, 241 Neb. 847, 491 N.W.2d 341 (1992). Therefore, this assignment of error will

not be considered.

### 5. SUMMARY JUDGMENT

In his fifth and final assignment of error, Howard asserts the district court erred in overruling his pretrial motions for summary judgment.

When reviewing a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences deducible from that evidence. *Sarpy County v. City of Springfield*, 241 Neb. 978, 492 N.W.2d 566 (1992). Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue of material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Overmier v. Parks, ante* p. 458, 495 N.W.2d 620 (1993); *Holden v. Schwer, ante* p. 389, 495 N.W.2d 269 (1993). The movant for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that if the evidence remains uncontroverted, the movant is entitled to judgment as a matter of law. *Alder v. First Nat. Bank & Trust Co.*, 241 Neb. 873, 491 N.W.2d 686 (1992).

Howard filed two motions for summary judgment before trial commenced; however, so far as we can determine from the record, a hearing was held only on the first one filed. Be that as it may, resolution of this case centered on but one issue: whether Howard acquired an insurable interest in the Corvette. Whether a party has an insurable interest in property is ordinarily a question of fact to be resolved by the fact finder. *Crowell v. Delafield Farmers Mut.*, 453 N.W.2d 724 (Minn. App. 1990), *aff'd* 463 N.W.2d 737.

At no time did Howard present any physical evidence of a title in his name; his testimony and that of his wife concerning the manner in which the vehicle came into Howard's possession must be viewed in light of the suspicious nature of the transaction they described and of the fire itself. Thus, for the reasons mentioned in the introductory portion of part III of

this opinion, the inferences to be drawn from those occurrences present genuine issues of material fact as to whether Howard acquired an insurable interest in the Corvette. The district court therefore correctly denied Howard a summary judgment.

## IV. JUDGMENT

The record failing to sustain any of Howard's assigned and discussed errors, the judgment of the district court is, as noted in part I above, affirmed.

AFFIRMED.