JOEL E. BISGARD, APPELLANT, V. JERRY R. JOHNSON, APPELLEE,
AND MOTOR CLUB INSURANCE ASSOCIATION,
GARNISHEE-APPELLEE.

*525 N.W.2d 225*

Filed December 13, 1994. No. A-93-241.

Robert M. Slovek, of Sodoro, Daly & Sodoro, for appellant.

David L. Welch, of Gaines, Mullen, Pansing & Hogan, for garnishee-appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

HANNON, Judge.

The appellant, Joel E. Bisgard, was shot in the stomach by appellee Jerry R. Johnson while Johnson was a passenger in an automobile that was insured by the garnishee-appellee, Motor Club Insurance Association. Bisgard obtained a default judgment against Johnson for $100,000 for his damages. This is an appeal from the dismissal of a garnishment proceeding in which Bisgard sought to collect the judgment by garnishing Motor Club. Bisgard maintains that the insurance policy Motor Club issued covering the automobile in which Johnson was riding insured Johnson against liability for his act of shooting Bisgard. After Motor Club answered the interrogatories of garnishment, both parties moved for summary judgment. The trial court denied Bisgard's motion, granted Motor Club's motion, and dismissed the garnishment proceedings. Bisgard appeals. We conclude as a matter of law that the policy did not insure Johnson against liability for his act of shooting Bisgard

for the following reasons: (1) The policy covered damages from an automobile accident only, (2) the policy covered damages only from the "use" of an automobile, and (3) the policy excluded intentional injuries. We also conclude that Motor Club is not estopped from denying coverage; the principle of issue preclusion does not prevent Motor Club from establishing that Johnson intentionally injured Bisgard as a matter of law. We therefore affirm.

### SUMMARY OF PLEADINGS AND EVIDENCE

On December 1, 1990, at about 12:15 a.m., Bisgard, then a 19-year-old man, was "hang[ing] out" and "cruising" with his friends in the general area of the Burger King restaurant situated near 76th and Dodge Streets in Omaha, Nebraska. Fred Pederson, Jr., and Johnson (the record does not show their age) were cruising in the same area in an automobile that was owned by Fred Pederson, Sr. Bisgard was led to believe that Pederson, Jr., and Johnson had assaulted a friend of Bisgard's. Angry and obscene words were yelled by Bisgard toward Pederson, Jr., and Johnson sometime before the shooting. These events are immaterial and will not be further described. While Bisgard was standing by the sidewalk near Dodge Street in front of the Burger King establishment, Pederson, Jr., was driving the insured vehicle west on Dodge Street with Johnson in the passenger seat. When the vehicle came abreast of Bisgard, it slowed and perhaps stopped. Johnson took out a .25-caliber pistol and shot Bisgard in the stomach from a distance of approximately 7 feet. Johnson was severely injured and spent a considerable amount of time in the hospital recovering from the gunshot wound.

Johnson pled nolo contendere to the charges brought against him and was sent to prison for his crimes.

On March 18, 1992, Bisgard sued Johnson for damages for personal injuries arising from the shooting, alleging that Johnson "was negligent in the discharge of a firearm in the direction of the Plaintiff," and on May 12, he obtained a default judgment against Johnson for $100,000.

On May 21, Bisgard's attorney wrote to Motor Club, demanding that it pay the judgment. A claims superintendent

for Motor Club, Phil Fried, answered that letter, denying the claim. Bisgard's attorney wrote again, and Fried replied. Since the terms of this correspondence bear directly on the issue of estoppel, the content of the correspondence will be summarized when that issue is considered later in this opinion. Fried's statement that Motor Club did not know about Bisgard's claim until after he received the attorney's letter of May 21 is not disputed.

On September 30, Bisgard's attorney filed an affidavit and praecipe of garnishment on the judgment Bisgard held against Johnson, alleging that Motor Club had property of or was indebted to Johnson. In Motor Club's "Answers to Additional Interrogatories" that it filed in response to the garnishment summons, Motor Club denied it owed Johnson any money or property. Motor Club admitted it issued an automobile policy to "Fred C. Pedersen [sic], Sr.," which was in force on December 1, 1990, providing liability insurance to covered persons legally responsible because of an auto accident with Pederson's vehicle. In the answer, Motor Club further alleged that the policy did not cover Johnson's act of shooting Bisgard because (1) Bisgard's gunshot injury was not the result of an automobile accident, (2) Johnson was not using the insured automobile within the meaning of the term "use," and (3) the policy does not provide liability coverage for any person who intentionally causes bodily injury or property damage.

Bisgard's attorney filed an "Application to Determine Garnishee Liability." In that document, Bisgard alleged the judgment; the garnishment; a summary of the answer; and the allegations that Motor Club's policy provided coverage for the reason that the accidental shooting arose out of the use and operation of a motor vehicle, and the shooting was committed by a person who is insured under the policy. The answer in garnishment and the application served as the pleadings to bring the matter before the court. Motor Club and Bisgard both filed motions for summary judgment.

Through attached affidavits, the following evidence was offered and received on the motions: the judgment, the petition upon which it was based, the insurance policy, the correspondence described below, a deposition of Johnson taken

before the default judgment was obtained, and a deposition of Bisgard taken during the garnishment proceedings. The aforementioned facts are gleaned from that evidence.

In Johnson's deposition taken in the original action, he testified that he was shooting at Bisgard to scare him. He did not testify that the gun discharged accidentally, but that in shooting the gun in Bisgard's direction he did not intend to hit him. The specific testimony on the issue is contained in the following questions propounded by Bisgard's attorney and answered by Johnson:

Q. With regard to the shot that hit Joel in the abdomen, what were you trying to do in discharging this gun in the direction of Joel?

A. Basically, to scare him.

Q. You didn't intend to cause him any personal injury?

A. No.

. . . .

Q. You were riding around, you'd had this confrontation, and you were going to, before you left, scare Joel and his friends by shooting the gun in their direction?

A. Right, yes.

Q. All right. When I say, "in their direction", did you specifically intend to shoot Joel Bisgard in the abdomen with the .25 caliber?

A. No.

Johnson went on to testify that the gun he was using was one of the most "unaccurate [sic] guns," and he did not think it was possible to hit Bisgard because he was drunk. He testified that the injury was the result of "some drunken carelessness on [his] part."

For purposes of the motions for summary judgment, the significant part of Bisgard's testimony is his description of the shooting. He testified that he was standing 5 to 8 feet from the street when the Pederson automobile drove by slowly and stopped or almost stopped. The passenger window was open, and Bisgard saw Johnson stick his hand out the window and point a gun at him. At that time, Johnson was looking directly at Bisgard. The gun fired, and Bisgard was hit in the stomach.

Bisgard gave no testimony that would support a finding that Johnson negligently shot Bisgard, although Bisgard did not and could not dispute Johnson's self-serving statement that he did not intend to hit Bisgard when he shot in Bisgard's direction.

## TRIAL COURT'S ORDER

In the trial court's docket note granting Motor Club's motion for summary judgment and denying Bisgard's motion for summary judgment, the court found there was no causal connection between the use of the vehicle and Bisgard's injury, that Motor Club's defense of "no coverage" was clear from the beginning, and that Motor Club was not estopped from raising its defenses.

## ASSIGNMENTS OF ERROR

Bisgard alleges the district court erred in (1) granting Motor Club's motion for summary judgment, (2) finding no causal connection between the use of the insured vehicle and Bisgard's injuries, (3) finding Motor Club was not estopped from raising the defense that there was not automobile "use," and (4) overruling Bisgard's motion for summary judgment. A motion for summary judgment should only be granted when the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Neb. Rev. Stat. § 25-1332 (Reissue 1989). Ultimately, these assignments raise only the question of whether Motor Club was entitled to a judgment of dismissal as a matter of law or whether Bisgard was entitled to a judgment as a matter of law. This question presents four issues: (1) Did the insurance contract by its terms provide liability insurance to Johnson when he shot Bisgard? (2) If not, is Motor Club estopped from denying coverage for the reasons pled in its answer to the garnishment interrogatories because these reasons differed from the reasons Motor Club gave for denying coverage before the garnishment proceedings commenced? (3) Is Motor Club bound by the fact that Bisgard obtained judgment against Johnson under an allegation of negligence? (4) Does Johnson's testimony that he shot at Bisgard deliberately but did not intend to hit him raise a material issue of fact as to whether he intentionally injured Bisgard?

## STANDARD OF REVIEW

In reviewing an order granting summary judgment, an appellate court views the evidence in a light most favorable to the nonmoving party and gives that party the benefit of all reasonable inferences deducible from the evidence. *Katskee v. Blue Cross/Blue Shield*, 245 Neb. 808, 515 N.W.2d 645 (1994). Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to a judgment as a matter of law. *Id.*

In considering questions of law, an appellate court has the obligation to reach conclusions independent of the determination made by the trial court. *Id.*

## DISCUSSION

*Coverage of Insurance Policy.*

We start this section with a summary of the principles by which an insurance contract is to be construed:

An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the policy.

*Katskee*, 245 Neb. at 812-13, 515 N.W.2d at 649.

The significant portion of the liability section of the policy issued by Motor Club to Pederson provides:

We will pay damages for bodily injury or property damage for which any covered person becomes legally responsible because of an auto accident. . . .

"Covered Person" as used in this Part means:

1. You or any family member for the ownership, maintenance or use of any auto or trailer.

2. Any person using your covered auto.

3. For your covered auto, any person or organization

but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under this Part.

(Emphasis omitted.)

The trial court ruled that Pederson's automobile insurance policy did not cover Johnson's actions in injuring Bisgard because there was no causal connection between the use of the insured vehicle and Bisgard's injury. We find this ruling was not in error.

■ The meaning of the words "arising out of the ownership, maintenance or use of the owned automobile" in automobile insurance policies has been analyzed a number of times by the Nebraska Supreme Court. In *Dairyland Ins. Co. v. Esterling*, 205 Neb. 750, 751, 290 N.W.2d 209, 211 (1980), the policy granted coverage for damages " 'arising out of the ownership, maintenance or use of the owned automobile . . . .' " The wife of the named insured left children that she was caring for unattended in the insured vehicle, and during that time, one child started the coat of another child on fire with a cigarette lighter. The injured child sued the insured's wife on the basis of negligent supervision. In *Dairyland Ins. Co.*, the court quoted *National Union Fire Ins. Co. v. Bruecks*, 179 Neb. 642, 139 N.W.2d 821 (1966), saying, " 'It seems patent, however, that some causal relation must exist between the injury and the use of the vehicle to come within the ambit of "arising out of the use of a vehicle." ' " *Dairyland Ins. Co.*, 205 Neb. at 754, 290 N.W.2d at 212. In *Dairyland Ins. Co.*, the injury clearly was not caused by the use of the automobile, but arguably might have arisen out of using the automobile as a playhouse for children. The Supreme Court held that using the automobile as a playhouse for children was not the type of use that was intended within the meaning of the policy and thus was not covered.

In *Bruecks*, a passenger riding in a car attempted to unload his gun and, in the process, accidently shot and injured the driver of the vehicle. The court held that although the negligent person was riding in and thus using the automobile at the time the injury occurred, the injury did not arise out of the use of the vehicle.

In a similar fashion, it can be argued that Johnson was using

Pederson's automobile by riding in it at the time he shot Bisgard. However, Johnson's act of using the automobile was not causally related to Bisgard's injury. Instead, the injury resulted from the bullet coming from Johnson's gun. Accordingly, we hold the trial court did not err in finding that Bisgard's injuries were not related to the use of the insured automobile and that the insurance policy did not cover Johnson's actions.

Also, in Motor Club's answer to the garnishment proceedings, it pled that Bisgard's injury was not the result of an auto accident. We observe that the policy provides coverage only when "any covered person becomes legally responsible because of an auto accident." (Emphasis omitted.) The trial judge did not rule on whether that pleaded defense was valid, but instead ruled that there was no causal connection between the use of the insured vehicle and Bisgard's injuries.

The effect of a provision limiting coverage of liability to damages "because of an auto accident" has not been decided by the Nebraska Supreme Court, but it has been considered by other jurisdictions. These jurisdictions have considered the effect of such insurance provisions when the injury resulted from crimes committed in the insured auto.

In *Farmers Insurance v. Grelis*, 43 Wash. App. 475, 718 P.2d 812 (1986), a stranger entered a parked vehicle with the owner's consent and then injured the owner while robbing him. The owner claimed to have been accidentally injured by the knife when the assailant tripped. The Washington court concluded that the average person would not consider the stabbing to be an automobile accident and held the liability provision did not cover the owner. The Washington court observed that the parties had cited numerous cases construing the words "arising out of the ownership, maintenance, or use of the owned automobile" and stated it felt those cases are not applicable in interpreting the meaning of the phrase "caused by an automobile accident." We agree. These provisions do have different meanings.

In *Allied Mut. Ins. Co. v. Patrick*, 16 Kan. App. 2d 26, 819 P.2d 1233 (1991), the insured was sued for "negligent sexual molestation" of children who were passengers in the auto. The

Kansas court held that " '[w]hatever else a negligent sexual molestation may be, it is not in plain, ordinary and popular sense an automobile accident.' " *Id*. at 27, 819 P.2d at 1234.

In *Jordan v. United Equitable Life Insurance Company*, 486 S.W.2d 664 (Mo. App. 1972), the policy provided coverage for accidental bodily injury caused solely by reason of an automobile accident. The insured was a taxicab driver who was robbed and shot by a passenger while in the cab. The Missouri court held the injury was not caused by an automobile accident. We conclude that when an automobile liability policy provides coverage for liability because of an "automobile accident," coverage extends only to injuries caused by an accident involving the insured automobile.

The above holding does not contradict the trial court's holding that there was no causal connection between Johnson's use of the covered automobile and Bisgard's injuries, but, rather, it provides another reason why Pederson's policy did not cover Johnson's act of shooting Bisgard. This court may affirm a grant of summary judgment on any ground available to the trial court, even if it is not the same reasoning relied upon below. *Logan Ranch v. Farm Credit Bank*, 238 Neb. 814, 472 N.W.2d 704 (1991). See, also, *Staman v. Yeager & Yeager*, 238 Neb. 133, 469 N.W.2d 532 (1991); *Gall v. Great Western Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985). Thus, in our judgment, the provision for coverage "because of an auto accident" clearly excludes coverage in this case.

We conclude that under the terms of Pederson's policy, Johnson was not insured against liability when he shot Bisgard, even if we assume that Johnson either negligently shot or negligently hit Bisgard, because Johnson's use of the insured vehicle was not causally related to Bisgard's injuries and because the injury was not caused by an auto accident.

*Binding Effect of Motor Club's Denial of Coverage.*

On May 21, 1992, the attorney representing Bisgard wrote Motor Club, informing it of Bisgard's $100,000 judgment and demanding that it pay the judgment. In the letter, Bisgard's attorney stated the injuries "arose out of the use and operation of the motor vehicle" and cited *National Union Fire Ins. Co. v.*

*Bruecks*, 179 Neb. 642, 139 N.W.2d 821 (1966), and a case decided in a federal court to support his position that Johnson was using Pederson's vehicle within the meaning of Pederson's liability insurance. He also cited *Dairyland Ins. Co. v. Esterling*, 205 Neb. 750, 290 N.W.2d 209 (1980), and argued his position. He further argued on the basis of cited authority that a minimal causal connection is all that is required. Bisgard's attorney also stated that in Johnson's deposition, he stated that he had no intent to shoot Bisgard, only to scare him. Therefore, any exclusion in the policy for intentional acts was inapplicable.

On June 15, Fried responded for Motor Club, stating:

How does one shoot another and only plan to scare him? If he had hit him in the foot I could possibly buy a story that he was shooting to scare him. I doubt that [sic] the case here.

I find that Fred C. Pederson Jr. was an excluded driver under the policy insuring the 1989 Mercury Cougar at the time this occurred.

We don't have any grounds to provide coverage for this event. Therefore, we will make no voluntary payment!

On July 15, Bisgard's attorney acknowledged receipt of the letter and stated, "You have declined to provide coverage for this occurrence for two reasons: (1) the act of shooting was intentional; and (2) Fred C. Pedersen [sic], Jr. was an excluded driver . . . ." He then explained that the evidence at the trial, from which the judgment was obtained, showed Johnson shot Bisgard negligently, not intentionally. He further explained that in his opinion the fact that the driver was not covered was immaterial. He ended by claiming Bisgard could collect attorney fees if Motor Club failed to pay the judgment in bad faith.

On July 17, the claims superintendent answered, stating, "I would think the thing that is most important in this case is does coverage extend and if it does was this an intentional act. I also think the answer to both of these questions is no and yes in that order." The remainder of the letter addressed the attorney fees issue.

When Motor Club answered in the garnishment proceedings, it denied coverage in summary because (1)

Bisgard's injury was not the result of an automobile accident, (2) Johnson was not using the insured automobile, and (3) the policy on the automobile does not provide liability coverage for any person who intentionally causes bodily injury or property damages. The third reason was clearly included within the claim superintendent's denial before litigation. However, Bisgard argues that the other pleaded reasons were not mentioned by Motor Club until after the litigation was started.

In Bisgard's brief, he argues that the rule in this state is that an insurer that gives one reason for its conduct and decision as to a matter of controversy cannot, after litigation has begun, defend upon another and different ground. Bisgard cites the following cases in support: *Howard v. State Farm Mut. Auto. Ins. Co.*, 242 Neb. 624, 496 N.W.2d 862 (1993); *Boren v. State Farm Mut. Auto. Ins. Co.*, 225 Neb. 503, 406 N.W.2d 640 (1987); *Mutual Benefit Life Ins. Co. v. Chisholm*, 213 Neb. 301, 329 N.W.2d 103 (1983); *Hamblin v. Equitable Life Assurance Society*, 124 Neb. 841, 248 N.W. 397 (1933); and *Continental Ins. Co. v. Waugh*, 60 Neb. 348, 83 N.W. 81 (1900).

The aforementioned rule is mentioned in the above cases; however, it has not been literally applied. After recognizing the above rule and citing the same cases, Justice Caporale stated the following in *Howard*: "However, unlike the situation presented here, the cases applying this rule dealt with circumstances whereunder an insurer altered its position in an attempt to defend upon an entirely separate and different ground." *Id.* at 637, 496 N.W.2d at 870.

Justice Caporale cited *Chisholm* and explained how the insurer in *Chisholm* had altered its position in an amended petition. In *Chisholm*, the insurance company changed its position after the deposition of its own officer showed there was no merit to the grounds it was using to deny coverage. In *Chisholm*, three justices concurred because the majority did not base its decision on estoppel. In the case at hand, Bisgard does not point out any claimed change of position due to Motor Club's "altered" statement of reasons.

In *National Union Fire Ins. Co. v. Bruecks*, 179 Neb. 642, 139 N.W.2d 821 (1966), the Supreme Court applied the rule to estop an insurer from denying coverage. However, in that case

the insurer's attorneys had taken charge of the insured's case for 17 months and then denied coverage. The court applied the doctrine of equitable estoppel and stated the rule that

" 'a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity.' . . ."

*Id*. at 653-54, 139 N.W.2d at 829.

The evidence shows that Bisgard's attorney had obtained a judgment against Johnson without notifying Motor Club. In so doing, he took the trouble to base liability on unspecific negligence, and he took Johnson's deposition when he was not represented. He did so without giving notice to Motor Club, the company that was the most likely insurer.

Bisgard does not claim that Motor Club changed its position after it answered the garnishment interrogatories. Furthermore, Motor Club is not bound by the summary of the grounds for denying coverage contained in the letter from Bisgard's attorney. In his second letter, Fried denied coverage, but did not specify the reasons. In the first letter, Bisgard's attorney recognized the possible weaknesses of his case. Fried did not waive these grounds, but, rather, ignored arguments about the use of the automobile.

If Motor Club did change its position from that expressed by its agent, we can find no basis for denying it the right to state those reasons in its answer. Accordingly, we find that Motor Club was not estopped from denying coverage on the basis of the two grounds discussed in the preceding section of this opinion.

Bisgard does not dispute that Motor Club's denial was based on the claim that Johnson intentionally injured Bisgard. However, Bisgard argues that this defense is not available in this case for the following two reasons: (1) Motor Club is bound by the previous finding that Johnson's actions were negligent and not intentional, and (2) there is no evidence controverting Johnson's testimony that he did not intend to injure Bisgard,

and thus, the exclusionary provision should not apply as a matter of law. We shall now consider these arguments.

*Possible Collateral Estoppel.*

The petition Bisgard filed to obtain a judgment against Johnson alleges that Johnson was "negligent in the discharge of a firearm in the direction of the Plaintiff" as the basis of liability. In the order of the judgment, the court found Bisgard is entitled to a judgment in the sum of $90,000 on his first cause of action, negligence, and in the sum of $10,000 on his second cause of action, negligent infliction of emotional distress. Bisgard maintains that under the doctrine of collateral estoppel, Motor Club cannot question the finding that Johnson negligently injured Bisgard.

The following are four conditions that must exist in order for the doctrine of collateral estoppel to apply: (1) The identical issue was decided in the prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the action. *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d 73 (1994); *McCook Nat. Bank v. Myers*, 243 Neb. 853, 503 N.W.2d 200 (1993).

The controlling issue on collateral estoppel in this case is whether Johnson was in privity with Motor Club while Bisgard was obtaining his judgment. The Supreme Court has defined the word "privity" as follows: " 'Privity requires, at a minimum, a substantial identity between the issues in controversy and showing the parties in the two actions are really and substantially in interest the same.' " *VanDeWalle v. Albion Nat. Bank*, 243 Neb. 496, 505, 500 N.W.2d 566, 573 (1993).

In *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990), the Supreme Court also quoted Black's Law Dictionary 1079 (5th ed. 1979), stating privity has also been defined as

"[m]utual or successive relationship to the same rights of property. In its broadest sense, "privity" is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one

person with another as to represent the same legal right. . . . Derivative interest founded on, or growing out of, contract, connection, or bond of union between parties; mutuality of interest."

235 Neb. at 838, 458 N.W.2d at 457.

In *Gottsch*, the Supreme Court also recognized the following:

"[D]ue process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to a prior suit or as a privy; and, where not so, that at least the presently asserted interest was adequately represented in the prior trial."

*Id.* at 837, 458 N.W.2d at 457 (quoting *Hickman v. Southwest Dairy Suppliers, Inc.*, 194 Neb. 17, 230 N.W.2d 99 (1975)).

In this particular case, the issue on privity is whether Johnson and Motor Club had such an identity of interest in the issue of whether Bisgard's injury was intentionally or negligently caused. We are unable to locate any Nebraska cases which consider whether a person who would benefit from liability insurance coverage has an identity of interest with the insurance carrier. It seems clear, however, that there is no identity of interest when two parties have diametrically opposed interests in the determination of an essential element.

In *Krohn v. Gardner*, 238 Neb. 460, 471 N.W.2d 391 (1991), the Supreme Court did hold that a person claiming to be covered by a liability policy was not in privity with injured parties when the insured brought a declaratory judgment against his insurance carrier for a determination as to whether the insurance company's policy covered liability for the damage suffered. The Supreme Court stated, " '[F]or the purpose of issue preclusion . . . the same question or desire to prove or disprove the same fact or set of facts is not a basis for privity between the litigants.' " *Id.* at 464, 471 N.W.2d at 395 (quoting *Gottsch, supra*). In the case at hand, the parties do not even have the same desire to prove the same facts.

*State Farm Fire & Cas. Co. v. Byrd*, 729 F. Supp. 1265 (N.D. Cal. 1990), a California case considered by the federal court under its diversity jurisdiction, was a case quite similar to the case at hand. In that case, a person by the name of Byrd caused

the death of a woman while holding her head under water during a sexual encounter in a partially filled bathtub. The victim's survivors obtained a judgment against Byrd by stipulation for $200,000. In that case, Byrd admitted liability for negligently causing the death of the woman, and in consideration, the survivors agreed not to levy execution upon Byrd's personal assets. The federal court granted a motion for summary judgment, determining as a matter of law that the homeowner's policy covering Byrd did not cover the event because the policy contained an exclusion for " 'bodily injury or property damage which is expected or intended by the insured.' " *Id*. at 1266. The court held the insurance company was not collaterally estopped on the issue of intent versus negligence. In making its decision, the court stated, "In particular, the manifest conflict between State Farm and Byrd on the issue of Byrd's intent destroys any privity which might have been inferred from State Farm's retention of counsel for Byrd." *Id*. at 1267. The court observed that any finding of willfulness or intent would have expanded Byrd's personal liability and would have been in State Farm's best interests. The court went on to hold that the defendant's conviction for murder established that the crime was intentional, and denied recovery.

We conclude as a matter of law that on the issue of whether Johnson intentionally or negligently injured Bisgard, the interests of Johnson and Motor Club are adverse. Therefore the doctrine of collateral estoppel does not apply, and the issue remains to be settled in this case.

*Exclusion of Intentional Injury.*

In his brief, Bisgard's attorney argues that the only issue before the trial court was the question of whether the acts of Johnson were intentional and thus not covered due to the exclusionary provision contained in the policy. Bisgard's attorney states that no evidence exists which contradicts Johnson's testimony that he did not intend to shoot Bisgard. He further argues that there is no factual dispute concerning the accidental nature of the occurrence. Thus, Bisgard's attorney argues the trial court erred in not finding there was coverage as

a matter of law and in denying Bisgard's motion for summary judgment.

The trial court granted Motor Club's motion for summary judgment by concluding there was no causal connection between the use of the automobile and Bisgard's injury. However, the trial court did not address whether the shooting was intentional. While such a determination was not necessary in order for the trial court to properly grant Motor Club's motion for summary judgment, this exclusion gives an additional reason why the motion for summary judgment should have been granted.

The " 'intended purpose of [exclusionary] clauses is to prevent extension to the insured of a license to commit whatever wanton and malicious acts he [or she] wishes, yet still fall under the coverage of [the] insurance policy.' " *State Farm Fire & Cas. Co. v. Geary*, 869 P.2d 952, 956-57 (Utah App. 1994) (citing *Barton v. Allstate Ins. Co.*, 527 So. 2d 524 (La. App. 1988)).

In the present case, the pertinent portion of the exclusionary clause contained in the policy is as follows: "EXCLUSIONS[:] A. We do not provide Liability Coverage for any person: 1. Who intentionally causes bodily injury or property damage." (Emphasis omitted.)

 We are convinced that under the facts in this case, Johnson's intent to injure Bisgard can be inferred as a matter of law. Numerous jurisdictions have recognized that the intent to injure can be inferred as a matter of law, especially when guns are involved, based on the nature of the act involved and the accompanying reasonable foreseeability of harm. *Geary, supra*. See, also, *American Family Mut. Ins. Co. v. Wubbena*, 496 N.W.2d 783 (Iowa App. 1992); *Barton, supra*; *Allstate Ins Co v Freeman*, 160 Mich. App. 349, 408 N.W.2d 153 (1987); *Auto-Owners Ins. Co. v. Smith*, 376 N.W.2d 506 (Minn. App. 1985); *Travelers Ins. Co. v. Cole*, 631 S.W.2d 661 (Mo. App. 1982); *Landis v. Allstate Ins. Co.*, 546 So. 2d 1051 (Fla. 1989). In *Geary*, the Utah court found that the insured may have truly intended subjectively to only frighten the party who got shot. The court stated that the insured's intentional firing of a shotgun in the injured party's direction two times rises to the level of an act which contains a " 'substantial probability that

certain consequences will result.' " *Id.* at 957 n.11. The court concluded that "the intentional firing of a gun in the direction of an individual qualifies as an act which carries with it the reasonable foreseeability of harm, from which we may infer the intent to injure." *Id.* at 957-58.

In *State Farm Fire & Cas. Co. v. Muth*, 190 Neb. 248, 207 N.W.2d 364 (1973), the Supreme Court analyzed whether intent can be inferred to invoke exclusionary clauses in insurance policies. In that case, a young boy fired a BB gun from a slow-moving automobile, and a pellet struck another person, causing loss of eyesight. The homeowner's policy provided that it did not apply " 'to bodily injury or property damage which is either expected or intended from the standpoint of the insured.' " 190 Neb. at 249, 207 N.W.2d at 365. The case came before the trial court as a declaratory judgment action, and the trial court found that when the boy caused the gun to discharge in the direction of the victim, he did not intend or expect to do bodily injury. The boy testified that he pointed the gun at the victim's feet without taking careful aim and that his intention was to scare somebody. There had been no conflict between the boy and the victim.

In deciding *Muth*, the Supreme Court stated the following:

> In accordance with the usual rule that the judgment of the trial court in an action where a jury has been waived has the effect of a verdict of a jury and will not be set aside unless clearly wrong, we feel ourselves bound by the findings of the trial judge that [the boy] did not intend to injure [the victim]. Belek v. Travelers Ind. Co., 187 Neb. 470, 191 N. W. 2d 819. While we might ourselves have come to a different conclusion than did the trial judge, we cannot say his findings were clearly wrong.

190 Neb. at 251, 207 N.W.2d at 365-66.

In *Muth*, the Supreme Court stated the following rule should be utilized when deciding whether an act is intentional in the context of exclusionary clauses in insurance policies:

> We hold on the basis of the authorities which we hereinafter cite that, under the language of the exclusion in question, an injury is either expected or intended if the insured acted with specific intent to cause harm to a third

party. It seems to us to be immaterial whether the injury which results was specifically intended, i.e., the exclusion would apply even though the injury is different from that intended or anticipated. We find it difficult to precisely delineate the scope of the rule and recognize that there will be difficulties in applying the rule in concrete cases.

*Id.* at 252, 207 N.W.2d at 366.

Thus, the court in *Muth* did not specifically rule on the situation in which someone pointed a gun directly at another, but claims he did not intend to hit the person fired upon.

In *Jones v. Norval*, 203 Neb. 549, 279 N.W.2d 388 (1979), the Supreme Court again dealt with the issue of implied intent in the context of insurance exclusionary clauses. In that declaratory judgment action, the policy contained an exclusion for " 'bodily injury or property damage which is either expected or intended from the standpoint of the Insured.' " *Id.* at 551, 279 N.W.2d at 390. The insured went to his victim's house to talk about certain derogatory remarks the victim had allegedly made to the insured's girl friend. The court stated that the insured's "testimony was that although he intended to hit [the victim], he only intended to cause a sting or a bruise but not a serious injury that would require medical attention." *Id.* at 550-51, 279 N.W.2d at 390. The victim was seriously injured, and the trial court directed a verdict against the insurance company for the amount of the judgment for the assault. The court held the following:

Although [the insured] may not have intended the specific injury which resulted, such specific subjective intent is not required to exclude coverage under the policy. The "intent" which is necessary to exclude coverage is not the intent to act nor the intent to cause the specific injury. Instead it is the intent to cause bodily injury to the person acted upon and it makes no difference if the actual injury is more severe or of a different nature than the injury intended.

*Id.* at 555, 279 N.W.2d at 392.

The court also stated, "The public policy against 'licensing' intentional and unlawful assault bolsters our conclusion. In the case before us the direct and inferential evidence from the very

nature of the act permits only one conclusion, that [the insured] intended to injure the plaintiff." *Id.* The court held the policy provision excluded coverage under these circumstances.

More recently, in *State Farm Fire & Cas. Co. v. Victor*, 232 Neb. 942, 442 N.W.2d 880 (1989), the Supreme Court affirmed the rule as expressed in *Jones*, stating that

> *Jones* stands for the proposition that "an injury is 'expected or intended' from the standpoint of the insured if a reason for an insured's act is to inflict bodily injury *or if the character of the act is such that an intention to inflict an injury can be inferred as a matter of law."*

(Emphasis in *Victor*.) 232 Neb. at 945, 442 N.W.2d at 882-83.

In *Victor*, the insured went to the house of a person whom he suspected of stealing money from others in attendance at his neighbor's birthday party for which the insured was the host. After a scuffle with another individual at the suspected thief's residence, the insured shot and killed a person who was standing in the doorway of the home. The insured testified that he thought the person in the doorway was the suspected thief, which it was. The court held that from the insured's actions, it could only be concluded that as a matter of law, the insured expected or intended to injure the suspected thief. As a result, the insured's liability to the suspected thief's estate was not covered by the insured's policy.

We think the following quote from Prosser cited in *Raby v. Moe*, 153 Wis. 2d 101, 450 N.W.2d 452 (1990), properly expresses the rationale of this rule as applied to this case:

> Intent, however, is broader than a desire to bring about physical results. It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does. . . . The man who fires a bullet into a dense crowd may fervently pray that he will hit no one, but since he must believe and know that he cannot avoid doing so, he intends it. *The practical application of this principle has meant that where a reasonable man in the defendant's position would believe that a particular result was substantially certain to follow, he will be dealt with by the jury, or even by the court, as though he had intended it.*

(Emphasis supplied.) William L. Prosser, Handbook of the Law of Torts § 8 at 31-32 (4th ed. 1971).

In the case at bar, Johnson testified that he did not intend to injure Bisgard, but he admitted shooting in his direction. Bisgard testified that Johnson was approximately 7 feet away and was looking right at Bisgard when Johnson fired the gun. Johnson did not claim the gun fired accidentally.

We conclude that any reasonable man who shoots a gun directly at another person standing only 7 feet away, while looking directly at that person, has to know there is a high probability that the bullet from that gun could hit that person. Therefore, as a matter of law, we find the wounding of Bisgard was substantially certain to follow from Johnson's act of shooting at him under the undisputed facts in this case. Hence, the exclusionary clause contained in Pederson's automobile insurance policy will preclude coverage to Johnson in this case.

AFFIRMED.