NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, A CORPORATION, APPELLEE AND CROSS-APPELLANT, v. JOSEPH M. BRUECKS, SR., ET AL., APPELLEES AND CROSS-APPELLEES, IMPLEADED WITH ALLSTATE INSURANCE COMPANY, APPELLANT AND CROSS-APPELLEE, ST. PAUL FIRE & MARINE INSURANCE COMPANY, A CORPORATION, APPELLEE AND CROSS-APPELLANT.

139 N. W. 2d 821

Filed January 28, 1966. No. 36057.

Stoehr, Rickerson & Caporale, for appellant.

Haney, Walsh & Wall, for appellee National Union Fire Ins. Co.

Sodoro & Meares, for appellee St. Paul Fire & Marine Ins. Co.

Kennedy, Holland, DeLacy & Svoboda, for appellees Campbell.

Floersch & Floersch, for appellees Bruecks.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

SPENCER, J.

This is an action for a declaratory judgment to have determined the coverages afforded to MacDowell Campbell and Scott Campbell by insurance policies issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania, hereinafter referred to as National; St. Paul Fire & Marine Insurance Company, hereinafter referred to as St. Paul; and Allstate Insurance Company, hereinafter referred to as Allstate. The action is brought by National against Joseph M. Bruecks, Sr., Joseph M. Bruecks, Jr., MacDowell Campbell, Scott Campbell, Allstate, St. Paul, and Nancy L. Campbell.

MacDowell and Scott Campbell are defendants in another lawsuit arising out of the shooting of Joseph M.

Bruecks, Jr., by a gun in the hands of Scott Campbell. That action will hereinafter be referred to as the tort action. At the time of the shooting, National insured the Campbells under a comprehensive personal liability policy. Allstate insured Joseph M. Bruecks, Sr., and his family, including persons using the automobile with his consent, under an automobile liability policy covering the car which Bruecks, Jr., was driving at the time of the shooting. St. Paul had in force an automobile liability policy on an automobile owned by the Campbells which extended coverage for the use of nonowned automobiles.

In the petition in the tort action it is alleged that on or about the 26th day of December 1961, Scott Campbell was hunting with certain other minors in west Omaha; that about 5:30 p. m. on said date, Bruecks, Jr., a minor, drove an automobile owned by his father and covered by the Allstate policy, to pick up said minors and return them to their homes in Omaha; that Scott Campbell sat in the right rear seat of said car and on the way back to Omaha, while said car was in motion, negligently and carelessly attempted to unload his rifle; and that in the process thereof said gun discharged, causing a bullet to penetrate the front seat of the automobile, striking Bruecks, Jr., the driver of said car, and causing serious injuries.

There are many allegations of negligence alleged in the petition against the Campbells as well as against Sears Roebuck & Company, a corporation, which sold the gun to the Campbells. However, there is no allegation of any nature suggesting a causal relationship of the incident pleaded to the use of the automobile. Bruecks, Jr., had not been hunting with the boys but had been sent out by his stepmother to pick up the boys and return them to their homes.

Immediately after the accident, notice was given by MacDowell Campbell to National, and he was told he had $50,000 coverage under his comprehensive personal

liability policy. The matter was referred by National to the law firm of Haney & Walsh, who will hereinafter be referred to as National's attorneys, for investigation. While there is a dispute as to the facts, for the purposes of this case we determine the following to be the facts: National's attorneys conducted an investigation by contacting persons having knowledge of the facts, including the Campbells. This initial investigation extended over a period of several weeks, and continued periodically until June 8, 1963. The entire investigation was under the control of National's attorneys. No notice of the accident was given to Allstate or to St. Paul prior to August 13, 1962.

In August of 1962, National's attorneys contacted the Campbells, suggesting the possibility of coverage being afforded under the Allstate policy written on the automobile in which the shooting incident occurred. They thereafter sent the Campbells a letter written by them for Scott Campbell's signature, to be returned to them for forwarding to Allstate. This was done.

The Campbells were led to believe that National was affording coverage and left the matter entirely in the hands of National's attorneys. The tort action was filed on May 17, 1963. The papers and summons served on the Campbells were immediately forwarded to National's attorneys. On June 8, 1963, some 3 weeks subsequent to the filing of the action against the Campbells, National's attorneys sent a notice to MacDowell Campbell that National did not intend to afford coverage under its policy. This was the first indication given the Campbells that National was denying coverage. A few days prior thereto, National's attorneys had indicated to the Campbells that the matter was progressing satisfactorily, and that the prospects of a settlement looked good. The Campbells then consulted other counsel. On June 17, 1963, National's attorneys filed a special appearance in the tort action on behalf of the Campbells. On July 17, 1963, a reservation of rights agreement was executed

between the Campbells and National, and National's attorneys have continued to represent the Campbells in the tort action.

The judgment of the trial court may be summarized as follows: (1) National is required to defend MacDowell Campbell in the tort action and to participate in any judgment against him; (2) National is estopped to deny coverage to MacDowell and Scott Campbell, and shall be primarily liable to participate in any judgment against them; (3) Scott Campbell was using the Brueck's automobile within the meaning of the terms of the Allstate policy, and Allstate has a primary duty to participate with National in the defense of the tort action as well as in any judgment entered; (4) National's and Allstate's participation shall be in proportion to the applicable limits of their respective policies; and (5) Scott Campbell was using the Bruecks' automobile within the meaning and terms of the St. Paul policy, and St. Paul shall be liable as an excess carrier in the event a judgment is rendered in excess of the combined coverage of National and Allstate. Allstate perfected an appeal to this court, and St. Paul and National have perfected cross-appeals.

The Allstate policy issued to Bruecks, Sr., afforded liability coverage to any person actually using the automobile with his permission for "* * * bodily injury sustained by any person * * * arising out of the ownership, maintenance or use, including loading and unloading, of the owned automobile or a non-owned automobile." The St. Paul policy issued to MacDowell Campbell afforded coverage to him and members of his family, including Scott, for "* * * bodily injury * * * arising out of the ownership, maintenance or use of the owned automobile" and also "with respect to non-owned automobile * * * provided his actual operation or (if he is not operating) the other actual use thereof is with the permission, or reasonably believed to be with the permission, of the owner and is within the scope of such permission,

* * *." The insurance policy issued by National to Mac-Dowell Campbell afforded comprehensive coverage for him and for Scott Campbell as follows: "To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury," and provided an exclusion from the above coverage of "the ownership, maintenance, operation, use, loading or unloading of (1) automobiles while away from the premises * * *."

It would seem that the obligation to defend a suit for an insured should be determined on the basis of whether the petition filed against him attempts to allege a liability within the terms of the policy. In the tort action, which is the basis for this declaratory judgment action, there is no allegation set out in the petition which would indicate that the action was brought as one arising out of the use of a motor vehicle. Ignoring, for purposes of discussion herein, the allegation of negligence as against Sears Roebuck & Company and until later as against MacDowell Campbell, the allegations of negligence against Scott Campbell may be summarized as failing to unload the gun previous to entering the automobile and in attempting to unload the gun in a moving automobile. These allegations in no way predicate recovery on the use of the automobile as such. The gun did not discharge as a result of being in the vehicle or for any reason even remotely connected with the vehicle. It seems clearly apparent that the tort action is not premised upon any connection with the automobile in which the shooting occurred, except as describing the situs of the act.

It is the position of both National and the Campbells that Scott Campbell was using the Bruecks' automobile with the permission of Bruecks, Sr., within the intent and meaning of the Allstate and St. Paul policies, and it is National's contention that by virtue thereof Scott Campbell is excluded from coverage under the National policy.

For purposes of discussion herein, we determine that

Scott Campbell was using the Bruecks' automobile within the meaning of the term "use" in the Allstate and St. Paul policies. See Metcalf v. Hartford Acc. & Ind. Co., 176 Neb. 468, 126 N. W. 2d 471, in which we said: " '* * * an automobile is being used by an individual who is traveling in it regardless of whether it is being operated by him or by another.' "

It seems patent, however, that some causal relation must exist between the injury and the use of the vehicle to come within the ambit of "arising out of the use of a vehicle." Many courts have found a causal relation to exist if the use was connected with the accident or the creation of a condition that caused the accident. The proximate cause of the injury here was the discharge of the gun. Was the discharge of the gun during the use of the automobile a sufficient connection with its use to be within the coverage provided by the "arising out of the use" clause of the Allstate and St. Paul policies? To put it another way, we must determine whether the fact that Scott Campbell was riding in the automobile at the time of the accident, making the automobile the situs of the accident, constitutes the accident one "arising out of the use of" the automobile, or, if not, whether it constitutes the creation of a condition that caused the accident within the terms of the policy. In this connection, it may be pertinent to observe that the injury could never have happened if Scott Campbell had not had a loaded gun in his possession in the automobile. The accident could just as readily have happened in the Bruecks' living room if Scott Campbell had carried the gun into the Bruecks' home. National and the Campbells argue that because the boys had been on a hunting expedition, it must necessarily be implied that Scott Campbell had permission to transport the gun in the automobile. This is obvious. The question, however, is whether he had permission to transport a loaded gun, when the ordinary experiences of mankind dictate that guns are to be unloaded when not intended for immediate use.

Is the construction contended for by National and the Campbells within the scope of any risk reasonably to be contemplated by the policy? Courts have the obligation to determine from the written contract the true intent of the parties. Here the terms of the contract are plain and unambiguous. The policy is intended to cover any injury caused by an accident arising out of the use of an automobile and a reasonably liberal construction should be in order if we are to effectuate the purpose of the contract. Here no one argues that the use of the car can in any way be considered the proximate cause of the injury. However, National and the Campbells do contend that there is a causal connection between the use of the automobile and the accident, and that this is sufficient to make the accident one arising out of the use of the automobile.

The words "arising out of the use" are very broad, general, and comprehensive terms, and are ordinarily understood to mean originating from, growing out of, or flowing from. See Schmidt v. Utilities Ins. Co., 353 Mo. 213, 182 S. W. 2d 181, 154 A. L. R. 1088. It was there held that injuries sustained in falling over blocks left on the sidewalk by the driver of insured's trucks after being used as ramps to facilitate the backing of the trucks up over the curb to a coalhole in the sidewalk was an accident arising out of the use of insured's vehicle. There the use of the blocks was necessary to facilitate the use of the truck. National relies upon Manufacturers Casualty Ins. Co. v. Goodville Mut. Casualty Co., 403 Pa. 603, 170 A. 2d 571, in which the court said "arising out of" means causally connected with, not proximately caused by, and that a "but for" causation, that is, a cause and result relationship, is enough to satisfy this provision of the policy. In that case, the court stated that a horse trailer was in use within the ownership, maintenance, or use clause of the insurance policy on the trailer while being pulled by a pickup truck insured by a different company, where facts disclosed that

at the time of the accident the trailer was being used to transport a horse.

National also cites Suburban Service Bus Co. v. National Mutual Casualty Co., 237 Mo. App. 1128, 183 S. W. 2d 376, in which the court held that an injury to a girl passenger arose out of the use of a bus within the meaning of the terms of a policy issued on the bus where the girl's injury was caused by fluid from a fire extinguisher which the driver of the bus discharged at the passengers to scare them into refraining from using water guns on him. A reading of that case convinces us that it is not in any way analogous to the case herein, for the reason that what the driver did was to prevent disorderly conduct which was interfering with the safe operation of the bus and was clearly incident to the use of the bus in transporting passengers.

The case of Fidelity & Casualty Company of New York v. Lott, 273 F. 2d 500, cited by National, is also clearly distinguishable on the facts from the instant one. There, the insured, spying three deer slightly below the road, brought the vehicle to a stop and leaning his gun over and against the vehicle fired at one of the deer. For some unexplained reason (as suggested by the court probably because the muzzle of the gun did not clear the curved top of the vehicle), the bullet tore down through the top of the car, was deflected downward, and killed one of the hunters who was sitting on the right front seat of the vehicle.

Allstate cites McDonald v. Great American Insurance Co., 224 F. Supp. 369, a Rhode Island case, in support of its position. That was a declaratory judgment action to determine whether the insurers under a comprehensive home owners personal liability policy and an automobile liability policy were required to conduct the defense of actions brought against the insured by persons claiming injury as a result of the insured's having thrown a cherry bomb from an automobile. The automobile liability policy involved was construed under Massachusetts law.

The court there held that in order to constitute an injury arising out of the ownership, maintenance, or use of a motor vehicle under Massachusetts law, the cause of injury to the victim must be something physically attached to or immediately connected in some manner with the motor vehicle or its operation, and held that coverage was not afforded by the policy.

The contracting parties plainly contemplated an accident immediately identifiable with the ownership, maintenance, or use of the vehicle. It does not appear to us, however, that the occurrence here will fit the plain, ordinary meaning of those categories within any reasonable interpretation of them. We agree that the terms themselves encompass many uses of an automobile other than the driving or directing the driving of it. We believe, however, to hold the injury herein to be one arising out of the use of the automobile, within the terms of the policy, is to do violence to the intent of the contracting parties, and to enlarge the contract by judicial construction.

The Campbells cite the case of Dorsey v. Fidelity Union Casualty Co. (Tex. Civ. App.), 52 S. W. 2d 775, as authority for their position. There, preparatory to entering an automobile to return from a hunting trip, one of the party unloaded his gun and in the process injured the driver who, after unloading his own gun, had entered the vehicle. The court held that the removing of the shells from the gun was so closely connected with the loading thereof into the car as to constitute a part thereof, and determined the injury was sustained as a result of operating or riding in the automobile. That case is clearly distinguishable from the instant one. Elementary safety precautions require the unloading of guns before they are transported from one place to another, and such act may constitute a part of the loading and unloading process.

Allstate Insurance Co. v. Valdez, 190 F. Supp. 893, a Michigan case cited by National, covers an analogous

situation and involved an interpretation of a loading and unloading provision of the use clause. In that case, a gun was discharged while it was being unloaded preparatory to placing it in the trunk of the car. Insured, who was 25 feet behind the car, slipped in the process of unloading the gun and it discharged, projecting a shell through the open trunk into the back seat, killing one of insured's companions. We find no fault with the holding that this was within the ambit of the loading and unloading provision of the policy, but do not see fit to apply it to an attempt to unload a gun in a moving automobile. On the facts herein, we hold that the accident is not one arising out of the use of an automobile within the terms of the policies involved.

The remaining question herein is the holding of the trial court that National is estopped to deny coverage to MacDowell and Scott Campbell. MacDowell Campbell advised his National agent of the accident immediately thereafter, and was told by the agent that he "* * * had $50,000 liability that would cover that sort of thing under my Home Owner's policy." Soon thereafter the Campbells were contacted by National's attorneys, who conducted the investigation. Various assurances were given by National's representatives to the Campbells. They were told early in the investigation that the matter was in the hands of the insurance company and they should not worry about it. When suit was filed May 17, 1963, National's attorneys accepted the summons and the petition. Subsequent thereto and before the letter of disclaimer of liability dated June 8, 1963, one of National's attorneys told Mrs. Campbell that "* * * things were looking up, things looked good, and we did not have anything to worry about," and in answer to a question as to whether that meant they were going to settle, National's attorneys said " 'It looks good.' "

The first knowledge that the Campbells had that Na-

tional was disclaiming liability was the letter of June 8, 1963. For a period of 17 months National had assumed complete and exclusive control of the case, with the complete cooperation of the Campbells. So complete was National's control of the situation that it is undisputed that its attorneys brought the matter of Allstate's possible coverage to the attention of the Campbells and prepared and forwarded the notice to Allstate. National knew the terms of its policy, and from its investigation must be assumed to have had full and complete knowledge of the facts. If it is now National's position that the accident is excluded from coverage by the terms of its policy, it knew that fact at all times during the 17 months it presumed to represent the Campbells. National argues that it made no false representations herein which could constitute a basis for estoppel. We determine that National's conduct was sufficient to constitute a representation, and is a most persuasive argument for the operation of the doctrine of equitable estoppel. We find, therefore, that by its conduct National construed the policy to provide coverage in this instance.

In May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448, we said: " 'Equitable estoppels operate as effectually as technical estoppels. They cannot in the nature of things be subjected to fixed and settled rules of universal application, like legal estoppels, nor hampered by the narrow confines of a technical formula. So, while the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. * * * The following, however, may be ventured as the sum of all cases: That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under

all the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity.' 10 R. C. L., sec. 19, p. 689. See, also, 31 C. J. S., sec. 59, p. 236." See, also, Roll v. Martin, 164 Neb. 133, 82 N. W. 2d 34.

National urges that there is no evidence in the record that the Campbells took any action or failed to take any action to their detriment because of reliance upon any acts of National. We determine that the assumption of complete control of the matter for a period of 17 months, with the consequent need of cooperation with National under the terms of the policy, in itself constitutes a sufficient showing of prejudice.

Ignoring for the moment the question of estoppel, it would appear that National is required by the terms of its policy to defend MacDowell Campbell in any event. There is nothing in any of the allegations in the tort action pertaining to the alleged negligence of MacDowell Campbell which in any way can be said to relate to or be connected with the use of the automobile which was the situs of the accident. Any negligence of MacDowell Campbell, if any, arose prior to the use of the automobile. An insurer's duty to defend an action against the insured is measured in the first instance by the allegations of the pleadings in the action against the insured, and if such pleadings state facts bringing the injury within the coverage of the policy, insurer must defend irrespective of the insured's ultimate liability to the plaintiff. See 7A Appleman, Insurance Law and Practice, § 4683, p. 436, and cases cited in footnote 26.

For the reasons outlined above, we reverse the judgment of the trial court so far as it pertains to Allstate and St. Paul, and direct the dismissal of the action as to each of them. In all other respects the judgment is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.