ALLIED MUTUAL INSURANCE COMPANY, A CORPORATION, APPELLEE,
V. ACTION ELECTRIC COMPANY, INC., AND CONNIE W. EMRY,
PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS D. EMRY,
DECEASED, APPELLANTS.
593 N.W. 2d 275

Filed April 9, 1999.   No. S-97-1223.

692

David Geier, of Healey & Wieland Law Firm, for appellants.

James A. Snowden and Michael A. England, of Wolfe, Snowden, Hurd, Luers & Ahl, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Action Electric Company, Inc. (Action), and Connie W. Emry, personal representative of the estate of Thomas D. Emry

(Emry's estate), appeal from a summary judgment granted in favor of Allied Mutual Insurance Company (Allied) on the grounds that Emry was not "using" the vehicle for purposes of insurance coverage at the time he was struck and killed by another vehicle. The issue presented is whether a person who has stopped and exited a vehicle in order to assist victims of a traffic accident is "using" the vehicle for purposes of a policy of automobile insurance.

## SCOPE OF REVIEW

The interpretation of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independent of the determination made by the lower court. *American Family Ins. Group v. Hemenway*, 254 Neb. 134, 575 N.W.2d 143 (1998).

## FACTUAL BACKGROUND

Thomas Emry (Emry) died September 17, 1993, while attempting to help persons involved in an automobile accident which Emry witnessed. Emry and his family had been to a high school football game and were returning home, traveling southbound on Highway 31. While stopped at a stop sign at the crossroads of Highways 31 and 36, Emry witnessed a car and a pickup truck collide in the intersection.

Emry exited his vehicle, telling his family he was going to see if anyone was hurt. As Emry approached the intersection, he raised his hands to warn other drivers, and he was struck by an underinsured automobile which traveled through the intersection at approximately 55 m.p.h. Emry was approximately 25 feet from his vehicle at the time he was struck.

The vehicle Emry was driving was covered by a "business auto policy" issued by Allied to Action. Emry was not listed as an insured on the policy, but he was using the insured vehicle with permission. The policy included the following provisions:

### SECTION II - LIABILITY COVERAGE
#### A. COVERAGE

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident"

and resulting from the ownership, maintenance or use of a covered "auto."

. . . .

1. WHO IS AN INSURED
The following are "insureds":
a. You for any covered "auto."
b. Anyone else while using with your permission a covered "auto" you own, hire or borrow . . . .

. . . .

## NEBRASKA UNDERINSURED MOTORISTS COVERAGE

. . . .

### A. COVERAGE
1. We will pay all sums the "insured" is legally entitled to recover as damages from the owner or driver of an "underinsured motor vehicle". . . .

. . . .

### B. WHO IS AN INSURED
1. You.
2. If you are an individual, any "family member".
3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". . . .

. . . .

### F. ADDITIONAL DEFINITIONS
The following are added to the DEFINITIONS Section:

. . . .

2. "Occupying" means in, upon, getting in, on, out or off.

### PROCEDURAL BACKGROUND
Emry's estate and Action filed a claim with Allied for underinsured motorist benefits, and Allied filed this action for declaratory judgment, seeking a determination of the scope of coverage under the policy. The issue before the trial court was whether the commercial automobile insurance policy issued by Allied provided underinsured motorist coverage for the damages resulting from the death of Emry. Allied contended that the policy was unambiguous and provided underinsured motorist

coverage for Emry as a permissive driver only if he was "occupying" the covered vehicle, since he was not a named insured under the policy. Emry's estate and Action conceded that he was not a named insured under the policy. However, they asserted that under Neb. Rev. Stat. § 60-577 (Reissue 1993) (now codified at Neb. Rev. Stat. § 44-6408 (Reissue 1998)), Allied could not limit underinsured motorist coverage to persons "occupying" the vehicle, when the liability portion of the policy covered persons "using" the vehicle. Emry's estate and Action contended that Emry was using the vehicle at the time he was struck and that, thus, he should be covered by the underinsured motorist portion of the policy.

The trial court found that even assuming that the coverages must be identical for insureds under the policy, Emry was not "using" the vehicle when he was struck and killed by the underinsured driver. The court distinguished between named insureds and their family members who are protected when they are operating or are passengers in a motor vehicle, as well as when they are engaged in other activities, and a permissive driver's coverage under a policy extending underinsured motorist coverage which depends on and is connected to use of the vehicle to which the policy applies. Relying upon *Farmers Union Co-op Ins. Co. v. Allied Prop. & Cas.*, 253 Neb. 177, 569 N.W.2d 436 (1997), and *National Union Fire Ins. Co. v. Bruecks*, 179 Neb. 642, 139 N.W.2d 821 (1966), the court concluded that the injuries to and the death of Emry did not arise out of the "use" of the insured vehicle.

The trial court found that Emry was struck at least 25 feet from the vehicle and was not engaged in activities connected to use of the vehicle such as changing a flat tire, loading or unloading materials or other articles carried by the vehicle, or other actions that were causally related to its use. Rather, the court determined that the vehicle was merely the means by which Emry arrived at the location of the accident. The court concluded that under the policy issued, the underinsured motorist coverage was not applicable to the accident that resulted in Emry's death and entered judgment accordingly in favor of Allied. Emry's estate and Action appeal.

## ASSIGNMENT OF ERROR

Emry's estate and Action claim the trial court erred in finding that the commercial automobile insurance policy issued by Allied did not provide coverage for the damages resulting from the death of Emry.

## ANALYSIS

### UNDERINSURED MOTORIST STATUTE

It is conceded that Emry was not a named insured under the policy issued by Allied. The policy states that underinsured motorist coverage is provided only for persons "occupying" the insured vehicle, which is defined in terms which imply actual contact or close physical proximity to the insured vehicle.

Emry's estate and Action argue that under the plain language of § 60-577(1) and public policy, the underinsured motorist coverage provided must apply to the same persons who are insured under the liability provisions of the policy. Allied contends that such limitation does not violate the language of § 60-577(1) or public policy.

Parties to an insurance contract may contract for any lawful coverage, and the insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract not inconsistent with public policy or statute. *American Family Ins. Group v. Hemenway*, 254 Neb. 134, 575 N.W.2d 143 (1998). Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Nicholson v. General Cas. Co. of Wis.*, 255 Neb. 937, 587 N.W.2d 867 (1999). In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *SID No. 1 v. Nebraska Pub. Power Dist.*, 253 Neb. 917, 573 N.W.2d 460 (1998). The interpretation of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independent of the determination made by the lower court. *American Family Ins. Group v. Hemenway, supra.*

A provision drawn by the insurer to comply with the statutory requirements of uninsured or underinsured motorist coverage must be construed in light of the purpose and policy of the statute. Such a provision, drawn in pursuance of a statutorily declared public policy, is enacted for the benefit of injured persons traveling on the public highways. The purpose of the Uninsured and Underinsured Motorist Insurance Coverage Act is to give the same protection to a person injured by an uninsured or underinsured motorist as the person would have if he or she had been injured in an accident caused by an automobile covered by a standard liability policy. Such provisions are to be liberally construed to accomplish such purpose. See *Stephens v. Allied Mut. Ins. Co.*, 182 Neb. 562, 156 N.W.2d 133 (1968).

Where a statutory omnibus provision is in conflict with the provisions of the insurance policy, the statute and not the policy provision is controlling. *Protective Fire & Cas. Co. v. Cornelius*, 176 Neb. 75, 125 N.W.2d 179 (1963).

At the time Emry was struck and killed, the relevant portion of the Underinsured Motorist Insurance Coverage Act provided: "[N]o policy insuring against liability . . . shall be delivered . . . unless coverage is provided for the protection of persons insured who are legally entitled to recover compensatory damages from the owner or operator of an underinsured motor vehicle . . . ." § 60-577(1).

The question is whether § 60-577 required Allied to provide underinsured motorist coverage to all persons insured under the liability provisions of its policy. In particular, Emry's estate and Action argue that under § 60-577, the phrase "persons insured" refers to the class of persons insured under the liability provisions of a given policy.

The court in *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92 (Colo. 1995), addressed a similar question. In that case, the liability provision of a business automobile policy covered permissive "users" of insured automobiles, while the uninsured and underinsured provision covered only permissive "occupiers." The relevant uninsured and underinsured statute required that policies provide uninsured and underinsured coverage " 'for the protection of persons insured thereunder.' " (Emphasis

omitted.) *Id.* at 96. The Supreme Court of Colorado held that the statute required that insurers offer uninsured and underinsured coverage to a class of persons as extensive as the class covered under the liability provision of an automobile insurance policy.

The court explained that read in the context of the rest of the statute, the plain meaning of the phrase "for the protection of persons insured thereunder" meant that insurers must provide uninsured and underinsured coverage for the protection of persons insured under the liability policy that the insurer was issuing. The court noted that this interpretation of the statute comported with the policies behind the uninsured and underinsured statute, which were to protect individuals from loss caused by financially irresponsible motorists and to make such coverage widely available. The court stated that absent such a reading of the statute, "[c]onsumers unaware of or unschooled in the vagaries of insurance contracts could be misled into believing they have purchased coverage when in reality they have not." *Id.* at 98.

Likewise, in *First Sec. Bank v. Doe*, 297 Ark. 254, 760 S.W.2d 863 (1988), the uninsured motorist endorsement provided coverage for persons "occupying" the vehicle, while the basic liability policy covered persons "using" the vehicle. The relevant uninsured motorist statute stated that insurers were required to provide uninsured motorist coverage in their policies for the protection of " 'persons insured thereunder.' " *Id.* at 257, 760 S.W.2d at 865. The Supreme Court of Arkansas concluded that the uninsured motorist statute required coverage if the policy covered liability arising from the use of the vehicle, because the statute expressed the intent to include in uninsured motorist coverage the persons included in liability coverage.

In *Kaysen v. Federal Ins. Co.*, 268 N.W.2d 920 (Minn. 1978), the comprehensive liability insurance coverage of a company vehicle provided in part that an "insured" included executive officers while the vehicle was being used in the business of the company. In contrast, the uninsured motorist portion of the policy did not include executive officers in the definition of an "insured." The statute in question provided that insurers were required to provide uninsured motorist coverage in their poli-

cies " 'for the protection of persons insured thereunder . . . .' " (Emphasis omitted.) *Id.* at 924.

The Supreme Court of Minnesota concluded that under the relevant statute, uninsured motorist coverage was required to be coextensive with the coverage afforded under the comprehensive liability portion of any given policy. The court concluded that this was the most sensible reading of the phrase "persons insured thereunder" as provided in the uninsured motorist statute. The court explained: "If insurers are allowed to designate a separate and smaller category of persons insured under uninsured motorist coverage, then the broad-based protection which the legislature intended to require could be contractually restricted at the whim of insurers." *Id.* at 924-25. See, also, *First Sec. Bank v. Doe, supra*; *Hornick v. Owners Ins. Co.*, 511 N.W.2d 370 (Iowa 1993); *Kats v. American Family Mut. Ins. Co.*, 490 N.W.2d 60 (Iowa 1992); *McMichael v. Aetna Ins. Co.*, 878 P.2d 61 (Colo. App. 1994); *Bertini v. State Farm Mutual Auto. Ins.*, 48 Ill. App. 3d 851, 362 N.E.2d 1355, 6 Ill. Dec. 435 (1977); *Roach v Central Nat'l Ins Co*, 60 Mich. App. 40, 230 N.W.2d 297 (1975); *Rau v. Liberty Mut. Ins.* Co., 21 Wash. App. 326, 585 P.2d 157 (1978).

We conclude that under the plain language of § 60-577, "persons insured" are those persons insured under the liability provisions of a motor vehicle policy. As such, Allied was required to provide underinsured motorist protection for persons "using" the vehicle and could not limit coverage to the smaller class of persons "occupying" the vehicle.

## WHETHER EMRY WAS "USING" VEHICLE

The next issue is whether Emry was "using" the vehicle under the terms of the liability portion of the policy. Again, this is a question of law, in connection with which we have an obligation to reach conclusions independent of the determination made by the court below. See *American Family Ins. Group v. Hemenway*, 254 Neb. 134, 575 N.W.2d 143 (1998). Also, whether an insurance contract is ambiguous and, therefore, in need of construction is a question of law. *Moller v. State Farm Mut. Auto. Ins. Co.*, 252 Neb. 722, 566 N.W.2d 382 (1997).

In previous cases, we have generally held that a causal relationship or connection must exist between an accident or injury and the ownership, maintenance, or use of a vehicle in order for an incident to fall within the meaning of the phrase "arising out of the ownership, maintenance, or use of a vehicle." See *Farmers Union Co-op Ins. Co. v. Allied Prop. & Cas.*, 253 Neb. 177, 569 N.W.2d 436 (1997). In *Farmers Union Co-op Ins. Co. v. Allied Prop. & Cas.*, we held that a passenger's injury from a dogbite while in the insured's vehicle did not fall under the insurance policy's limitation that the injury arise out of the ownership, maintenance, or use of the automobile. We stated that we have defined the words "arising out of the use" as very broad, general, and comprehensive terms that are ordinarily understood to mean originating from, growing out of, or flowing from and that "but for" causation was required. We concluded that there was no causal connection between the vehicle itself or its permanent attachments and the dogbite, requiring that something peculiar to the vehicle itself causally contribute to the accident. Heretofore, we have not addressed whether a person who has witnessed a traffic accident and has stopped and exited a vehicle in order to assist victims of the accident is using the vehicle for purposes of a policy of automobile insurance.

In *Rau v. Liberty Mut. Ins. Co.*, *supra*, a truckdriver was struck by an uninsured motorist after he briefly left his truck to inquire about directions. The driver parked the truck at the curb of the southbound lanes, crossed four lanes of traffic on foot to ask for directions from another truckdriver, and in returning was struck by an uninsured motorist. The court concluded that the truckdriver was using the vehicle at the time he was struck, explaining it was common sense that the parties contemplated the driver of a delivery truck on his route might have occasion to leave the truck to ask for directions.

The court in *Rau* discussed what it means to "use" a vehicle within the contemplation of an uninsured motorist endorsement. Citing *Hartford Accident & Indem. Co. v. Booker*, 140 Ga. App. 3, 230 S.E.2d 70 (1976), the court pointed out that the "use" of a vehicle depends upon the factual context of each case. The term does not imply remoteness but does extend beyond physical contact at least to the point where control over

the vehicle is easily or reasonably at hand and, particularly, when it is still being utilized. The court described that among other factors to be considered in determining whether a person is "using" a vehicle is whether the person is " 'vehicle oriented' " at the time of the injury. *Rau v. Liberty Mut. Ins. Co.*, 21 Wash. App. 326, 334, 585 P.2d 157, 162 (1978).

In *Monroe Guar. Ins. Co. v. Campos*, 582 N.E.2d 865 (Ind. App. 1991), an employee of a tow-truck company had driven his tow truck to a parking lot to confer with a police officer about towing a vehicle. The employee waited in the police cruiser for the results of a Breathalyzer test to determine whether the vehicle would need to be towed. After being informed that he was to tow the vehicle, the employee exited the police cruiser with the intention of proceeding to the vehicle to be towed to determine how it could safely be removed from the roadway. As he was exiting the police cruiser, the employee was struck and injured by an uninsured motorist.

The court determined that the tow-truck employee was using the tow truck at the time he was struck. The court explained that reasonable persons would expect that a tow-truck company employee must engage in activities during the towing process which require that the employee exit the tow truck. The court concluded that the employee was "using" the tow truck in a manner contemplated by the parties to the insurance contract.

In *Harris v. Magee*, 573 So. 2d 646 (Miss. 1990), the crew of a construction company was dispatched to a jobsite. A slow-moving crane departed first, followed by the job foreman in a company truck and two other employees in company vehicles. The vehicles encountered the crane on the side of the road after it had mechanical difficulties. The foreman parked his vehicle approximately 75 feet from the crane, exited the vehicle, and attempted to repair the crane. While crawling from beneath the crane, he was struck and killed by an uninsured motorist. The court held that the foreman was "using" the company truck when he was struck and concluded that stopping to repair the crane was a necessary aspect of the truck's operation.

Similarly, in *Federated Mutual Implement & Hardware Ins. Co. v. Gupton*, 241 F. Supp. 509 (E.D. S.C. 1965), the court held that an employee of a gas station was using the company vehi-

cle while pouring gasoline into another vehicle stranded on the shoulder of a roadway. The court explained that the exact definition of the term "use" was elusive and not capable of a definition which would leave everyone comfortable. Whether or not an injury arises from the use of a motor vehicle within a liability policy or statute depends upon the factual context of each case. The court considered whether the injury to the gas station employee was a reasonable consequence of the use of the company vehicle and concluded it was obvious that it was within the contemplation of the parties that the vehicle would be used as a service station truck and that the operation of delivering gasoline on the highways was a necessary and incidental adjunct.

The court in *Hartford Accident & Indem. Co. v. Booker*, 140 Ga. App. 3, 230 S.E.2d 70 (1976), held that a sanitation service employee was using a garbage truck when he was struck approximately 30 feet from the truck. The court explained that in defining the word "use," one must look to the contemplation of the parties entering into the insurance contract. The court concluded that common sense dictated that the parties contemplated the truck would be loaded and unloaded and that it would be necessary for the driver to walk down the side of the road near his truck in order to collect garbage.

In *Stevens v. United States Fid. & Guar. Co.*, 345 So. 2d 1041 (Miss. 1977), the court held that a wrecker operator's injuries arose out of the use of the wrecker when he was struck after having exited the wrecker and begun to sweep away debris from the vehicle he was going to tow. The court noted it was obvious that the wrecker would be used for removing disabled vehicles from the highway and that removing debris from the highway was a necessary part of that operation. The court explained that the operator's "temporary absence" from the wrecker did not amount to abandonment of the use of the wrecker. *Id.* at 1044.

In *Great American Ins. Co. v. Cassell*, 239 Va. 421, 389 S.E.2d 476 (1990), a firefighter was struck by an uninsured motorist while standing in an intersection completing a required fire report after a fire had been extinguished. The firefighter was 20 to 25 feet away from the firetruck, but the court held that the firefighter's death arose out of the use of the truck. The court noted that the report was part of the firefighter's mission and

that the mission had not been completed when the accident occurred.

In *Falls v. N.C. Farm Bureau Mut. Ins. Co.*, 114 N.C. App. 203, 441 S.E.2d 583 (1994), the court held that the driver was "using" the insured vehicle when he was hit by an underinsured motorist while walking along the road in search of mechanical assistance after the vehicle had broken down. Although the driver was approximately one-half mile from the vehicle at the time he was injured, the court concluded that there was a causal connection between the driver's injury and his use of the vehicle. The court stated: "But for the vehicle becoming disabled, the journey would not have been abandoned." *Id.* at 208, 441 S.E.2d at 585. See, also, *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92 (Colo. 1995); *Randall v. Liberty Mut. Ins.* Co., 255 Va. 62, 496 S.E.2d 54 (1998); *Oberkramer v. Reliance Ins. Co.*, 650 S.W.2d 300 (Mo. App. 1983); *Maring v. Hartford Casualty Ins. Co.*, 126 N.C. App. 201, 484 S.E.2d 417 (1997); *Nationwide Mutual Ins. Co. v. Davis*, 118 N.C. App. 494, 455 S.E.2d 892 (1995).

From the above cases, we conclude that whether a person is "using" a vehicle depends upon the factual context of each case and upon the contemplation of the parties to the contract. One factor in determining "use" is whether the activity can reasonably be expected to occur in relation to the operation of the vehicle. Another factor is whether the person is still "vehicle oriented" at the time of the occurrence. See *Rau v. Liberty Mut. Ins. Co.*, 21 Wash. App. 326, 585 P.2d 157 (1978).

Under the facts presented, we conclude that Emry was "using" the company vehicle at the time he was struck and killed by the underinsured motorist. Emry's journey home was suddenly and unexpectedly interrupted by an accident in the intersection he was about to cross. Emry exited the vehicle temporarily to see whether anyone was hurt. He had not completed his intended journey and would have soon continued to drive home had he not been struck.

Such an activity could reasonably be expected to occur in relation to Emry's use of the vehicle. As part of the operation of the insured vehicle, a driver could reasonably be expected to temporarily exit the vehicle in order to assist victims of a traf-

fic accident which the driver had just witnessed and which occurred in the driver's intended path. Thus, Emry's actions were part of the reasonably expected use of the vehicle as contemplated by the parties.

## CONCLUSION

We reverse the judgment of the trial court, and remand the cause thereto with directions that the court enter judgment consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

CONNOLLY, J., concurring in part, and in part dissenting.

I agree with the majority opinion that Allied was required to provide underinsured motorist protection for persons "using" the vehicle and could not limit coverage to the smaller class of persons "occupying" the vehicle. However, I respectfully dissent from the majority's conclusion that Emry was "using" the vehicle at the time he was struck. The majority opinion recognizes that a causal relationship or connection must exist between an accident or injury and the ownership, maintenance, or use of a vehicle in order for an incident to fall within the meaning of the phrase "arising out of the ownership, maintenance, or use of a vehicle." The majority opinion correctly cites *Farmers Union Co-op Ins. Co. v. Allied Prop. & Cas.*, 253 Neb. 177, 569 N.W.2d 436 (1997), for the proposition that "but for" causation is required. However, the majority ignores the test as set out in *Farmers Union Co-op Ins. Co.*

In *Farmers Union Co-op Ins. Co.*, we noted that we "require that something peculiar to the vehicle itself causally contribute to the accident." *Id.* at 183, 569 N.W.2d at 440. The cases cited by the majority in the instant case all support this general proposition. It is a peculiar characteristic of delivery trucks that their drivers will need to ask for directions, of tow trucks that their drivers will need to tow cars, of construction vehicles that a foreman will need to stop and repair construction equipment, of gas station trucks that a gas station attendant will need to pour gasoline into a stranded car, of garbage trucks that a garbage collector will need to pick up garbage, of a firetruck that a firefighter will complete a fire report, and of any vehicle that the driver will need to go for help if the vehicle breaks

down. However, it is not a peculiar characteristic of an ordinary vehicle that such a vehicle will be used to help the victims of an accident involving another vehicle. Such a use would be peculiar to an ambulance, but that is not the type of vehicle at issue here.

Nonetheless, the majority concludes that the vehicle was "used" in the instant case. The majority accomplishes this feat by deleting the peculiarity requirement, stating that in determining "use," we need only consider whether the activity can reasonably be expected to occur in relation to the operation of the vehicle and whether the person was "vehicle oriented." The majority's failure to include a peculiarity requirement in its new test renders the test meaningless. Indeed, one could contemplate that stopping for ice cream will occur in relation to the operation of a vehicle and that such a stop would be "vehicle oriented." Likewise, one could conclude that a dogbite will occur in relation to the operation of a vehicle when a dog is in the vehicle and that the dogbite would be "vehicle oriented." Thus, by adopting the "vehicle oriented" test, the majority has implicitly overruled this court's holding in *Farmers Union Co-op Ins. Co.* and started a descent down the proverbial slippery slope.

STEPHAN, J., joins in this concurrence and dissent.